# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **EARL CRAIG,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No: 3:22-cv-181** |
| **William Lee, Governor of the State** | ) | |
| **of Tennessee, in his official capacity;** | ) | |
| | ) | **Judge Campbell** |
| **And,** | ) | |
| | ) | **Magistrate Judge Frensley** |
| **David Rausch, Director of the Tennessee** | ) | |
| **Bureau of Investigation, in his official** | ) | |
| **capacity.** | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXTEND STAY OF PROCEEDINGS

Comes now Plaintiff, by and through Counsel, and submits to this Honorable Court this memorandum of law in support of his motion to extend the stay of these proceedings in light of the detailed, deliberate briefing process currently underway in the Middle District of Tennessee in *John Doe #1, et al. v. William Lee, et al.*, United States Middle District of Tennessee Case No. 3:21-cv-590 (hereinafter "*Does #1 – 9*"). Plaintiff would show:

## I. Procedural History and Factual Background

### A. Procedural history

This case was stayed by joint request, initiated by the Defendants, while the Defendants appealed the separate *Does #1 – 9* case to the United States Sixth Circuit Court of Appeals. (ECF 67, <u>Order</u>). Defendants took the appeal in *Does # 1 – 9* after losing a lengthy streak of *ex post facto*-based claims in the Middle and Eastern Districts of Tennessee, in which district court

1

judges repeatedly granted injunctive relief to plaintiffs subjected to retroactive enforcement of the "Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004." T.C.A. § 40-39-201 *et seq.* (hereinafter, "SORVA"). Prior to issuing the stay the Court granted Plaintiff's contested request for a preliminary injunction. (ECF 63, Order). The TBI removed Plaintiff from the registry shortly after the preliminary injunction was issued, and Plaintiff thus began living as a free man again for the first time in decades.

## B. Life post-injunction

For Plaintiff, the injunction has meant a significant improvement in his professional, family, and religious life. (Ex. A, Doe Declaration). While on the registry, Plaintiff had constant fear and anxiety due to ongoing police "compliance checks" at his house, which sometimes occurred late at night. Plaintiff's professional life has also benefited, with Plaintiff being able to work in areas that were previously restricted to him and go on out-of-state work trips that previously would have required permission for each trip. *Id.*

Plaintiff's family life has also changed dramatically. Plaintiff can travel freely with his grandchildren, and he and his wife can finally take their grandchildren camping in the park. Plaintiff's faith is very important to him, and he deeply appreciates being able to finally bring his grandchildren to church with him. *Id.*

To the extent that the TBI Director now wishes to take back the freedom that Plaintiff has finally earned, the freedom that Plaintiff should have had for the past several years, it is an existential threat to Plaintiff and his family. Thanks to the Court's preliminary injunction, Plaintiff and his family have finally had the opportunity to rebuild the lives they should have had for the past several years. This nascent chance to rebuild should not be taken from Plaintiff and his family lightly.

### C.  Developments in the *Does #1 – 9* Litigation

On May 15, 2024, the Sixth Circuit panel assigned to the *Does #1 – 9* case issued its opinion.  *Doe v. Lee*, 102 F.4th 330 (6th Cir. May 15, 2024).  The Sixth Circuit's opinion is a "mixed bag" in terms of "winners" and "losers."  On the one hand, it reaffirms that *Snyder* is binding precedent, and recognizes that retroactive enforcement of much of SORVA's enforcement scheme is likely unconstitutional under *Snyder*; on the other, it held that parts of the registry regime deemed "regulatory" may be enforced retroactively. After the panel opinion issued, the *Does No. 1 – 9* plaintiffs petitioned for reconsideration and *en banc* Sixth Circuit review of this opinion.  However, the Sixth Circuit denied this request on August 13, 2024.  On August 21, 2024, the mandate issued.

On August 28, 2024, the Middle District issued an order outlining how *Does #1 – 9* will proceed on remand.  (Ex. B, *Does #1 – 9* Order).  As discussed in more detail *infra*, the long and short of the order appears to be that (a) the TBI remains liable under 42 U.S.C. § 1983 for proximately causing *ex post facto* violations by local law enforcement, and (b) the *Does #1 – 9* injunctions against the TBI will not be modified unless and until both a detailed statutory *ex post facto* analysis has been completed, and the TBI has implemented substantial recordkeeping and record publication reforms to ensure that retroactive registration of offenders will not inexorably result in *ex post facto* violations by local law enforcement.

### II.  Argument

As all parties have previously agreed, the legal findings that come out of *Does No. 1 – 9* have significant relevance to Plaintiff's case.  (ECF 66, Joint Motion).  In light of that acknowledged relevance, and the clear implications for Plaintiff's case of the finding that the TBI cannot at this time constitutionally subject *ex post facto* former offenders to registration,

Plaintiff respectfully asks the Court to extend the stay of this matter to allow time for the Middle District's process in the *Does #1 – 9* case to play out, in order to see whether the Court can conform the TBI's system of retroactive SORVA enforcement to the limitations imposed by the U.S. constitution.

District courts have inherent power to exercise their discretion to stay proceedings before them. *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). In exercising this discretion, one the recognized purposes of a stay is to "conserve judicial resources and avoid duplicative litigation." *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 820 (6th Cir. 2020) (Bush, J., dissenting). Thus, district courts have "inherent authority to 'control [their] docket[s] in promoting economies of time and effort for the court, the parties, and parties' counsel.'" *Jordan v. City of Detroit*, 557 Fed. Appx. 450, 456 – 457 (6th Cir. 2014) (quoting *Gonzalez v. Ohio Cas. Ins. Co.*, 2008 U.S. Dist. LEXIS 70371, *1 (E.D. Mich. 2008)).

Here, in light of the Middle District's thorough, deliberate process on remand for moving forward in *Does #1 – 9*, an immediate resumption of litigation in Plaintiff's case would be a waste of time and resources that could easily result in possible conflicting outcomes – especially given the recognized need for systemic TBI reform in order to avoid future *ex post facto* violations by law enforcement. Indeed, as discussed in more detail *infra*, should Plaintiff be forced to proceed immediately, without waiting on the Middle District's *Does #1 – 9* TBI reform process to be completed, Plaintiff intends to massively expand the scope this litigation. The fact that Plaintiff's perceived need to expand this litigation with new claims, new theories, and many potential new defendants could be impacted by the Middle District's process in *Does #1 – 9* further justifies continued patience before resuming the litigation in Plaintiff's case.

4

**A. The Middle District's next steps in *Does #1 – 9* justify deferral of Plaintiff's case**

On August 28, 2024, the Middle District issued an order in *Does #1 – 9* articulating the process for going forward in the wake of the Sixth Circuit's opinion. (Ex. B, <u>*Does #1 – 9*</u> <u>Order</u>). The thrust of the order is that (a) the TBI is liable to *Does #1 – 9* under 42 U.S.C. § 1983 for causing them to be subjected to violations of their rights by local law enforcement even if the TBI's role is, if assessed in a vacuum, merely "regulatory"; (b) the Middle District will not modify the injunctions against the TBI until the parties have thoroughly briefed, and the court has resolved, the provision-by-provision "regulatory vs. punitive" SORVA analysis mandated by the Sixth Circuit, and (c) even after that statutory analysis has occurred, the injunctions still will not be modified unless and until the TBI has implemented a recordkeeping and publication system that will safeguard registered offenders from further violations of their constitutional *ex post facto* rights by local law enforcement. *Id*.

Given the substantial briefing and systemic reformation that the Middle District will require before even beginning to contemplate modifying the injunctions in *Does #1 – 9*, it seems redundant, wasteful, and duplicative to reactivate Plaintiff's case now – particularly in light of the reality that Plaintiff's is just one of many, many *ex post facto* SORVA claims currently pending in the Tennessee district courts. Indeed, over the course of the past several years literally <u>scores</u> of *ex post facto* SORVA cases have been filed in the Middle and Eastern Districts of Tennessee.[1] If all of the *ex post facto* cases in the Tennessee district courts each had their own independent process for (a) assessing the punitive or regulatory character of each SORVA provision, and (b) determining the systemic reforms necessary for the TBI to undergo before

---

[1] Undersigned Counsel has thirty-five such cases pending, and is generally aware that there are other attorneys who filed even more during the 2023 – 2024 period in which the Attorney General's Office generally did not oppose preliminary injunctions for *ex post facto* claimants whose offense dates predated the original SORVA's August 1, 2004 effective date.

retroactive SORVA enforcement can constitutionally resume, the waste of judicial, attorney, and financial resources that would occur would be extreme. Moreover, the risk that these parallel processes would arrive at different, conflicting conclusions – particularly with regard to the exact TBI reforms needed as a prerequisite to constitutional SORVA enforcement – would be unacceptable. Thus, the wiser course is to allow the Middle District's process to unfold in *Does #1 – 9* and then resume the litigation of Plaintiff's case at an appropriate point, when and if the Middle District has determined that the TBI is capable of registering offenders retroactively in such a way as to not cause mass *ex post facto* violations.

It has been twenty-one years since the Supreme Court last weighed in on this issue. *Smith v. Doe*, 538 U.S. 84 (2003). Since then, the country's registry laws have evolved from the relatively unobtrusive "first generation" registry law at issue in *Smith* to the complex web of virtual prison imposed by Tennessee and other states on registered offenders. *See Doe v. Snyder*, 834 F.3d at 694, 705 (6th Cir. 2016) (holding that Michigan's registry regime had become something "altogether different from and more troubling than Alaska's first-generation registry law," such that retroactive enforcement of it violated the *ex post facto* clause). The federal and state courts have been left to grapple with this problem in the wake of *Smith*.

In spite of *Smith*, there have been numerous instances of federal and state courts across the country validating *ex post facto* challenges to various registry regimes. *E.g., Hoffman v. Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951, 957 – 961, 963 (E.D. Wis. 2018) (granting summary judgment to civil rights plaintiffs based on finding that municipality's sex offender ordinance violated *ex post facto* clause); *Evenstad v. City of West St. Paul*, 306 F. Supp. 3d 1086, 1093 – 1100, 1102 (D. Minn. 2018) (granting civil rights plaintiff's motion for preliminary injunction based on finding that plaintiff was likely to prevail on *ex post facto* claim against municipal sex

6

offender ordinance); *Millard v. Rankin*, 265 F. Supp. 3d 1211, 1223 – 1232 (D. Colo. 2017) (finding that Colorado's SORVA regime constituted unconstitutional "cruel and unusual punishment."); *United States v. Wass*, 2018 U.S. Dist. LEXIS 112257, *7 – 13 (E.D.N.C. 2018) (Dismissing on *ex post facto* grounds a criminal indictment alleging violation of federal registry statute); *Doe v. Miami-Dade Cnty.*, 846 F.3d 1180, 1183 – 1186 (11th Cir. 2017) (denying motion to dismiss an *ex post facto* challenge against Florida registry's residential restrictions); *Commonwealth v. Williams*, 574 Pa. 487, 525 – 528 (Penn. 2003) (holding that Pennsylvania's registry regime's criminal enforcement provisions were punitive for *ex post facto* purposes); *Wallace v. State*, 905 N.E.2d 371, 377 – 384 (Ind. 2009) (applying the *Mendoza-Martinez* factors to hold that under the Indiana state constitution, retroactive enforcement of Indiana's registry regime constituted prohibited *ex post facto* punishment); *Sanchez v. State*, 215 Md. App. 42 (Md. Ct. App. 2013) (holding that retroactive enforcement of Maryland registry amendment violated Maryland state constitutional right against *ex post facto* punishment); *People v. Betts*, 507 Mich. 527 (Mich. 2021) (holding that Michigan's amended registry laws violated both the Michigan and U.S. ex post facto clauses); *State v. Hinman*, 2023 MT 116 (Montana 2023) (holding that Montana's amended registry statutes violated Montana state constitutional ex post facto clause); *Starkey v. Okla. Dep't of Corr.*, 2013 OK 43 (Okla. 2013) (holding that retroactive enforcement of Oklahoma registry amendments violated Oklahoma constitution's ex post facto clause); *Prynn v. Settle*, 848 Fed. Appx. 93, 99 – 103 (4th Cir. 2021) (reversing grant of motion to dismiss *ex post facto* claim against retroactive enforcement of Virginia's registry); *Doe v. Wasden*, 982 F.3d 784, 790 – 792 (9th Cir. 2020) (reversing district court's dismissal of *ex post facto* claim against retroactive enforcement of Idaho's registry regime, and remanding to district court to conduct punitive effects analysis of Idaho's statutes); *Doe v. Labrador*, 679 F.Supp. 3d 1019, 1031 –

7

1036 (D. Idaho 2023) (denying motion to dismiss *ex post facto* challenge to Idaho's registry regime). Thus, although *Smith* is of course binding precedent, the reality that *Smith* upheld a registry that bears little resemblance to the registries of today provides ample grounds to depart from it – as many courts already have.

Likewise, it must be recognized that *Smith* was premised on the scientifically unsupported mythology that claimed that every convicted sex offender is a *serial* sex offender – the false notion that, "The risk of recidivism posed by sex offenders is 'frightening and high.'" *Smith*, 538 U.S. at 183 – 184 (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002)).[2] Indeed, *Smith*'s sole source for this claim, *McKune*, relied solely on a citation to Department of Justice statistics that were based on a single study of a group of offenders who had been released from incarceration in 1983. *McKune*, 536 U.S. at 33 (citing Sex Offenses 27; U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners released in 1983, p. 6 (1997)). In contrast, more recent studies conducted by the DOJ and other entities, including Tennessee's own TBI, have largely debunked this myth. (Ex. C, Roger Przybylski, Recidivism of Adult Sexual Offenders, U.S. Department of Justice Office of Justice Programs Office of Sex Offender Monitoring, Apprehending, Registering, and Tracking (July 2015)) (reporting on several recidivism studies, including a meta-analysis finding that "the sexual recidivism estimates for all offenders in the study were 14 percent at 5 years, 20 percent at 10 years, and 24 percent at 15 years."); (Ex. D, TBI Study, at 3) (showing that sex offenders recidivate at lower rates than other offenders, with only 28 out of 506 sex offenders recidivating with a "similar offense"). Indeed, of particular relevance to *ex post facto* claimants was a finding in Przybylski's report, based on a meta-analysis of multiple studies, in which it was determined that "the rate of reoffending

---

[2] Of course, one can hardly fail to notice that this this "serial sex offender" mythology arose during the same time period as the myth of the "super predator." https://eji.org/news/superpredator-myth-20-years-later/.

decreased the longer offenders had been offense-free." *Id.* at 2. Thus, Przybylski's meta-analysis showed that the category of offenders at issue in the ongoing *ex post facto* federal court litigation – former offenders who, by definition, have gone decades without committing a sexual offense – are the least likely to reoffend. *Id.* ("only 7 percent of the offenders who were offense-free at [5 years] sexually recidivated during the next 5 years of follow up."). Thus, by the time the Sixth Circuit issued its 2016 opinion in *Snyder*, the *Smith* mythology had already been called into serious question. *Snyder*, 834 F.3d at 704 (citing to multiple studies casting doubt on the *Smith* mythology, including one suggesting that sex offenders "are actually *less* likely to recidivate than other sorts of criminals.") (emphasis in original).

All that being said, if the Sixth Circuit does end up hearing another future appeal in *Does #1 – 9*, the eventual record that comes out of Judge Trauger's current process may support a different outcome – one that recognizes the impossibility of permitting retroactive registration pursuant to SORVA without inviting retroactive unconstitutional SORVA enforcement. Moreover, whatever the Sixth Circuit might hold in such a hypothetical future appeal, the time and record may finally be ripe for the Supreme Court to return to this issue – to move past the mythology of *Smith*, and reckon honestly with the registries of today.

### B. The outlook under the Sixth Circuit's *Does #1 – 9* paradigm is a massive expansion of the scope of this litigation

#### 1. New municipal defendants

Should Plaintiff be forced to litigate now based on the Sixth Circuit's *Does # 1 – 9* paradigm, the outlook is a massive expansion of this litigation in order to obtain the multitude of injunctions necessary in order for Plaintiff to have any real hope of preserving his constitutional rights. Prior to the Sixth Circuit's opinion, Tennessee's federal district courts had collectively found that Tennessee's SORVA regime needed to be enjoined "as a whole" in order to uphold

9

the constitutional prohibition against *ex post facto* punishment for those registrants who committed their offenses prior to the enactment of the registry enforcement provisions that run afoul of *Doe v. Snyder*. *E.g. Doe #11 v. Lee*, 609 F. Supp.3d 578, 615 (M.D. Tenn. 2022); *Does v. Lee*, 659 F.Supp. 3d 865, 891 – 895 (M.D. Tenn. 2023) ("There is no evidence before the court that TBI or other sectors of law enforcement are actually capable of implementing – or authorized to implement – a judicially created, tiered system of registration based on the registrant's date of offense."). The Sixth Circuit appears to have rejected this approach, holding that under Tennessee's "elision" doctrine the Court can conduct provision-by-provision analysis to determine which SORVA provisions are regulatory and which are punitive. *Doe v. Lee*, 102 F.4th 330, 338 – 342 (6th Cir. May 15, 2024). The Sixth Circuit went on to say that under Tennessee's scheme most[3] of the provisions that would likely be held "punitive" under *Snyder* are enforced by local law enforcement agencies rather than the TBI, and that enjoining the TBI from enforcing provisions that it does not enforce is not appropriate. Thus, the Sixth Circuit indicated that the *Does #1 – 9* injunctions should be modified to permit the TBI to enforce those provisions that do not violate the constitution.

However, once again Judge Trauger's opinions on this issue correctly assess the reality of the situation, which is that it is nothing but a cruel joke to think that under the present system Tennessee's local law enforcement agencies can meaningfully honor the *ex post facto* rights of a retroactively registered offender. Thus, Plaintiff anticipates that should this litigation recommence now he will be forced to amend his complaint to drop the Governor while naming, at a minimum, the following parties:

---

[3] The Sixth Circuit opined that Tennessee's classification system of labeling offenders as, *e.g.*, "violent" based solely on the nature of their qualifying conviction offense is "questionable under *Snyder*." *Doe*, 102 F.4th at 341 – 342 (citing *Snyder*, 834 F.3d at 705.

1) The **TBI Director**, in his official capacity (to proceed against him under both a 42 U.S.C. § 1983 causation theory, as well as for his direct role in implementing Tennessee's unconstitutional offender classification scheme);

2) The **Attorney General for the State of Tennessee**, in his official capacity (to seek a declaratory judgment regarding SORVA's constitutionality as applied to Plaintiff). *Kelly v. Lee*, 2020 U.S. Dist. LEXIS 78369, *8 (E.D. Tenn. 2020) (finding that the Attorney General, pursuant to T.C.A. § 29-14-107, is a proper party for a declaratory judgment action regarding the constitutionality of Tennessee's sex offender registration and monitoring laws);

3) **Davidson County**, Tennessee (to enjoin the local sheriff's office from enforcing SORVA's punitive provisions against Plaintiff *ex post facto*);

4) **The City of Goodlettsville**, Tennessee (to enjoin the local police department from enforcing SORVA's punitive provisions against Plaintiff *ex post facto*);

5) The District Attorney for the **20th Judicial District of Tennessee** (to enjoin the local District Attorney's Office from enforcing SORVA's punitive provisions against Plaintiff *ex post facto*);

6) All counties, cities, towns, or other municipal entities in Tennessee that Plaintiff either (a) definitely intends to go to or travel through or (b) would intend to go through or travel through but for SORVA (to enjoin the local law enforcement agencies of these various municipalities from enforcing SORVA's punitive provisions against Plaintiff *ex post facto*). *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 – 160 (2014) (holding that a plaintiff has standing to bring a pre-enforcement suit where he alleges an intention to engage in constitutionally protected

behavior that a statute prohibits, and "there exists a credible threat of prosecution thereunder."); *Boone Cty. Republican Party Exec. Comm. V. Wallace*, 2024 U.S. App. LEXIS 22556 (6th Cir. Sept. 5, 2024); *See Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 – 758 (6th Cir. 2019) (discussing the requirements for prospective injury standing in the ADA context); *S&M Brands, Inc. v. Summers*, 393 F.Supp. 2d 604, 617 (M.D. Tenn. 2005)("In light of these principles, Defendant does not contest the premise that a party directly affected by a statute has standing to challenge it as a person who has sustained or is 'in danger of sustaining some direct injury as a result' of the enforcement of that statute.") (quoting *Brown v. Ferro Corp.*,763 F.2d 798, 801 (6th Cir. 1985). This would likely include **all contiguous counties to Davidson County, Knox County**, **Hamilton County**, **Shelby County**, **all counties along the I-40 and I-65 corridors** all cities, towns, and other municipalities located within the aforementioned counties, and any other municipal governments with jurisdiction over areas that Plaintiff reasonably expects to spend time in.

Thus, Plaintiff anticipates that if he is forced to proceed now based on the Sixth Circuit's paradigm he will be forced to add scores of new municipal defendants. Substantively speaking, based on the Sixth Circuit's *Does #1 – 9* and *Snyder* opinions Plaintiff can proceed against these new municipal defendants confident in his chances of victory, so long as he is able to demonstrate prospective injury standing against them. However, for Plaintiff, the putative defendants, and the Court the process required for Plaintiff to achieve victory will be complex, time consuming, and resource intensive.

As a matter of Due Process, Plaintiff will have to serve the multitude of new defendants with the amended complaint. Plaintiff will then immediately move for a preliminary injunction

12

against each of the new defendants, each of which will have the right to respond to Plaintiff's motion to raise whatever defenses believed appropriate. The numerous new defendants will also have to respond to Plaintiff's amended complaint. The Court will be tasked with conducting case management amongst the numerous parties, each represented by their own legal team. The Court will also have to resolve Plaintiff's motion for preliminary injunction against each defendant, giving each response its due regard even though the Sixth Circuit has already largely preordained the outcome of Plaintiff's anticipated motion. For those defendants against whom Plaintiff is able to establish prospective injury standing, the Court will then presumably grant some kind of preliminary injunction to protect Plaintiff's constitutional right against *ex post facto* punishment. Thus, Plaintiff will likely earn "prevailing party" status early on in the case against most or all of the putative new defendants. 42 U.S.C. § 1988.

The parties will of course need to conduct discovery, and then litigate summary judgment. Presumably, Plaintiff will win summary judgment against most or all of the new municipal defendants after this lengthy, complex, and expensive process. This will then result in Plaintiff filing a very significant fee and expense petition pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54, which the Court will presumably grant since Plaintiff will have prevailed in this 42 U.S.C. § 1983 litigation. The responsibility for this bill will, of course, ultimately fall to the Tennessee taxpayers. *Ronald Reid v. William Lee, et al.*, U.S. Middle District of Tenn. Case No. 3:20-cv-00050, ECF 100, Order (awarding undersigned Counsel attorney's fees in prior *ex post facto* case, and finding that $600 per hour was a reasonable rate for Counsel's time in that case).

In the meantime, if this litigation all plays out without an injunction in place to keep Plaintiff off the registry, Plaintiff will have to either (a) conform his behavior to remain in compliance with Tennessee's unconstitutional enforcement provisions, or (b) face the virtual

13

certainty that Tennessee's local law enforcement agencies will rampantly and repeatedly violate Plaintiff's constitutional right against *ex post facto* punishment. (Ex. B, <u>*Does #1 – 9* Order</u>). If (b) occurs, Plaintiff will then have to either amend his complaint again, or just file a separate new federal court lawsuit in the appropriate venue, to seek compensation from the culpable individual law enforcement officers and their employing municipal entities for these new constitutional violations. 42 U.S.C. § 1983; *Ronald Reid v. Lee*, 597 F. Supp. 3d 1177, 1200 – 1204 (M.D. Tenn. 2022) (granting summary judgment to the plaintiff in a 42 U.S.C. § 1983 claim against the municipal government of Nashville and Davidson County based on Metro's policy of proactive SORVA enforcement); T.C.A. § 8-8-301 *et seq.* (imposing vicarious liability on counties for the misconduct of sheriff's deputies). Based on the holdings in *Snyder* and *Does #1 – 9*, Plaintiff will presumably win those *ex post facto* damages claims as well, with the ultimate cost for those damages, attorney's fees, and litigation expenses once again being borne by the Tennessee taxpayer.

### 2. New theories against the TBI

Should Plaintiff be forced to proceed now under the paradigm articulated in the Sixth Circuit's *Does # 1 – 9* opinion, Plaintiff anticipates advancing three new theories against the TBI in addition to the *Snyder/Does 1 – 9* claim advanced against the municipal entities:

- The TBI acts as the ringleader of a civil conspiracy with other law enforcement agencies to enforce SORVA on former offenders such as Plaintiff in violation of their constitutional rights;

- The TBI's classification scheme is unconstitutional, and without that classification scheme Plaintiff would no longer be subject to registration because he would be eligible for T.C.A. § 40-39-207's "petition off" procedure; and,

14

- The re-registration of Plaintiff by the TBI would violate Plaintiff's Due Process rights by subjecting him to an enforcement regime that is "void for vagueness."

a. **The TBI is the ringleader of a civil conspiracy to enforce SORVA in violation of former offenders' constitutional rights**

As Judge Trauger aptly put it in her recent *Does #1 – 9* order, "The Director plays a limited role in Tennessee's registry scheme in the same way that the engine plays a limited role in a car. Every single decision made by any official based on the registry is a direct result of action by the Director, who possesses exclusive control over what the registry actually says." (Ex. B, *Does #1 – 9* Order, at 7). Thus, while the Director has portrayed himself in the past several years of federal court litigation as little more than a mere "records clerk,"[4] in reality he is nothing short of the ringleader in a civil conspiracy composed of state, local, and federal law enforcement agencies working together to enforce SORVA in Tennessee on all qualifying former offenders – the U.S. Constitution be damned. *See Rieves v. Town of Smyrna*, 67 F.4th 856, 861 – 865 (6th Cir. 2023) (discussing 42 U.S.C. § 1983 civil conspiracy).

In *Rieves v. Town of Smyrna*, the Sixth Circuit explained:

> Section 1983 civil conspiracy claims do not contain a 'personal involvement' requirement. Such a standard would defeat the purpose of permitting a civil conspiracy because, at its core, "section 1983 permits a jury to hold co-conspirators liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out."

*Rieves*, 67 F.4th at 863 (quoting *Sanchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Thus, the Sixth Circuit clarified that the emphasis in civil conspiracy is whether there is a "shared plan," rather than "personal involvement… in every wrongful or overt act." *Id.* at 864. Moreover, as was already established before *Rieves*, a "facially legitimate operation" can be actionable as a 42

---

[4] For instance, based on the record before it the Sixth Circuit described the Director as having only "limited record-keeping powers" in the *Does #1 – 9* opinion. *Does v. Lee*, 102 F.4th at 341 – 342.

U.S.C. § 1983 conspiracy if it becomes a vehicle for the violation of people's constitutional rights. *Id.* (discussing *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015)). Thus, to prove a civil conspiracy under 42 U.S.C. § 1983 a plaintiff must show:

1) A single plan to injure another through unlawful action;

2) That the alleged co-conspirator shared in the general conspiratorial objective; and,

3) That an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Rieves*, 67 F.4[th] at 862.

Here, there is unquestionably a single plan to injure former offenders such as Plaintiff, whose *ex post facto* rights are supposed to protect them against at least a significant proportion of SORVA. Indeed, whatever esoteric point the Director may wish to make about the "Tennessee Code Annotated" not being "the law,"[5] the scheme articulated at T.C.A. § 40-39-201 *et seq.* certainly qualifies as a "plan" that the TBI and Tennessee's local law enforcement agencies faithfully and collectively execute to strip former offenders like Plaintiff of their freedom, dignity, and privacy. Given the disdain that the Director and his law enforcement cohorts have shown thus far for the innumerable federal court findings that SORVA suffers from severe *ex post facto* problems, it is apparent that this "single plan" has an improper purpose.

The Director has largely been permitted to portray the role of the "records clerk" throughout much of Tennessee's *ex post facto* SORVA litigation, to the point that the Sixth Circuit's *Does #1 – 9* opinion described the Director as having only "limited record-keeping powers." *Does v. Lee*, 102 F.4[th] at 341 – 342. However, in reality the Director and his law enforcement cohorts share a general conspiratorial objective of jointly enforcing SORVA in

---

[5] *Does #1 – 9*, U.S. Sixth Circuit Case No. 23-5248, ECF 17, at 49 – 51.

violation of the constitution.  Indeed, the truth is that in addition to collecting former offenders'

information, maintaining the registry, and publishing former offenders' information, the TBI also

actively collaborates with local, state, and federal law enforcement agencies to proactively

enforce SORVA. (Ex. E, <u>TBI Social Media</u>; Ex. F, <u>TBI 2021 – 2022 Report</u>; Ex. G, <u>TBI SOP re:</u>

<u>NCIC</u>).  Thus, the TBI provides training to other agencies on how to conduct proactive

"compliance operations," joins with other agencies to plan and execute such compliance

operations, refers alleged SORVA violators to local agencies for arrest and prosecution, uses

mandatory directives to require local agencies to obtain warrants for alleged SORVA absconders

in their areas, publicizes information about wanted SORVA violators and encourages members

of the public to contact law enforcement about them, and provides legal advice to local agencies

regarding the scope of SORVA's enforcement restrictions.  *Id.* The TBI acts as the lead agency

in these collaborations, drafting policies and guidelines for registry enforcement within the

"Tennessee Fusion Center",[6] and describes its own role in this scheme as one of providing

"strategic planning and operational oversight" to the other agencies.  (Ex. F, <u>TBI 2021 – 2022</u>

<u>Report</u>, at 46).  Thus, far from being just a "records clerk" the TBI is in fact the ringleader of this

civil conspiracy.

Finally, countless "overt acts" have been committed by both the TBI and by Tennessee's

local law enforcement agencies in furtherance of this conspiracy through proactive SORVA

enforcement, arrests, incarcerations, and prosecutions. These acts have persisted as a general

policy despite the federal courts' innumerable pronouncements regarding SORVA's *ex post facto*

problems, with the TBI and its cohort law enforcement agencies continuing to enforce SORVA

on all qualifying former offenders who have not personally obtained a court order enjoining the

---

[6] https://www.tn.gov/tbi/law-enforcement-resources/tennessee-fusion-center/tennessee-fusion-center-faqs.html.

enforcement of SORVA against them. Thus, prior to getting his own injunction Plaintiff and the vast majority of other former offenders in Tennessee were fully cowed into compliance with this unconstitutional regime. (ECF 17-2, <u>Doe Declaration</u>); *see Snyder*, 834 F.3d at 703 ("[T]hose irons are always in the background since failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment."). Moreover, while 42 U.S.C. § 1983 civil conspiracy does not require that the TBI have personally engaged in any of these overt acts itself in order for the Director to be liable, there is ample evidence demonstrating that the TBI has in fact engaged in extensive overt acts in furtherance of this conspiracy. *Rieves*, 67 F.4th at 863; (Ex. E, <u>TBI Social Media</u>; Ex. F, <u>TBI 2021 – 2022 Report</u>; Ex. G, <u>TBI SOP re: NCIC</u>).

**b. Plaintiff's SORVA classification is unconstitutional**

As the Sixth Circuit acknowledged in *Does #1 – 9*, "[T]o the extent [the TBI] categorizes registrants based on the crime of their conviction and without an individualized assessment, that function may be questionable under *Snyder*." *Lee*, 102 F.4th at 342. Granted, the Sixth Circuit's opinion could have been more direct in this assessment, *e.g.* by stating, "this function is unconstitutional under *Snyder*." However, it is hard to see how the TBI's "questionable" classification scheme ultimately comes out any other way. Tennessee's classification of offenders between "sexual," "sexual against children," "violent," and "violent against children" is based solely on conviction offense. T.C.A. § 40-39-201. Thus, whatever reform, rehabilitation, or growth a particular offender may have gone through over the years, he will be forever branded based on the worst decision he has ever made – even if it is one that is literally decades-old. Worse, this brand goes beyond merely stating the offender's offense – *e.g.,* that the offender committed a particular sexual offense in the 1990's – rather, it is a present-tense label such as "VIOLENT." The Sixth Circuit has already acknowledged that this classification

18

scheme is constitutionally "questionable," presumably because it is akin to the antiquated punishment of "branding." Given the multitude of prior Tennessee district court findings to the effect that much of SORVA is punitive within the meaning of the *ex post facto* clause, Plaintiff presumes that the Court will find that this scheme does in fact violate the constitution.

Presuming that the Court will find that this conviction-based classification scheme is unconstitutional, the implications for Plaintiff and the majority of other *ex post facto* plaintiffs are extremely significant. First, to the extent that TBI is permitted to register Plaintiff and publish information about him, it would no longer be able to brand Plaintiff as "VIOLENT" on its public government website. Second, the TBI and Tennessee's local law enforcement agencies would no longer be able to use this classification to impose additional restrictions and obligations on Plaintiff. Third, for this particular Plaintiff the end of the classification system is essentially a "back door" claim to being off the registry. "If Doe was merely a sexual offender instead of a 'violent sexual offender,' he would have gained the right, ten years after the end of his active supervision on parole or probation, to petition the TBI for termination of his registration requirements." *Doe v. Bredesen*, 507 F.3d 998, 1001 fn. 3 (6th Cir. 2007). Thus, Tennessee's registry scheme allows a standard "sexual offender" to petition off the registry after ten years of compliance, whereas a "violent" offender has to remain on for life. *Id.* Therefore, if a particular plaintiff cannot be classified under one of these "lifetime registration" categories, he should not be forced to remain on the registry if he has already completed his ten years of post-sentence registry compliance.

In Plaintiff's particular case, he long ago completed his ten years of post-sentence registry compliance. (Ex. H, Judgments) (sentencing Plaintiff to six years with all but six months suspended to in 1993). Thus, but for Tennessee's unconstitutional "violent" classification

of him, Plaintiff would have long ago petitioned off the registry.  T.C.A. § 40-39-207.

Moreover, while the TBI might argue that Plaintiff has never attempted to petition off, it is

abundantly clear from the TBI's handling of this issue in the past that it would have been futile

for him to do so.  (*E.g.* Ex. I, <u>Sample TBI Correspondence</u>).  Thus, there is no good reason to

require Plaintiff to go back on the registry and petition now, given that the TBI's unconstitutional

regime precluded Plaintiff from having had the *bona fide* opportunity to do so years ago.

Therefore, to account for the TBI having essentially robbed Plaintiff of being able to petition off

after ten years' compliance, the Court should grant Plaintiff's *ex post facto* claim and issue a

permanent injunction prohibiting the TBI from ever re-registering Plaintiff for his original

qualifying offense.

### c.  The re-registration of Plaintiff would cause him to be subjected to violations of his right to Due Process

While the Sixth Circuit did not agree with Middle District of Tennessee's application of

Tennessee's "elision" doctrine as a matter of state law, the Sixth Circuit has not addressed

whether the hypothetical elided scheme that would result from the process that the Middle

District is now having to go through will pass muster under the Due Process clause.  (Ex. B,

<u>*Does #1 – 9* Order</u>).  In particular, the Due Process question this new paradigm raises is whether

registration of Plaintiff would subject him to a an enforcement regime that is "void for

vagueness."  *See FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 – 254 (2012) ("A fundamental

principle in our legal system is that laws which regulate persons or entities must give fair notice

of conduct that is forbidden or required.").

The Due Process clause requires "the invalidation of laws that are impermissibly vague."

*Id.* More specifically, "[T]he void for vagueness doctrine addresses at least two discrete but

connected due process concerns: first, that regulated parties should know what is required of

them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* In the SORVA context, retroactive registration of persons for whom the enforcement provisions are void on *ex post facto* grounds implicates both concerns. Indeed, "[Law enforcement's] ability to enforce Tennessee's restrictions *at all* is inextricably tied to their ability to do so without breaking the law. For that, they rely on the registry to tell them what they need to know." *Doe #1 et al. v. Lee*, Middle District of Tennessee Case No. 3:21-cv-590, ECF 151, Page ID # 2836. Thus, as the Middle District has already noted, "While local law enforcement officers may be able to look up offense dates on their own, it is obviously impractical to expect them to engage in complex retroactivity calculations on the fly. The Director, however, has left those local officials totally adrift." *Id.* at Page ID # 2836. Indeed, even the notion that law enforcement has the theoretical ability "to look up offense dates on their own" gives more credit than is warranted, since in reality the TBI's accuracy rate in publishing registered offenders' offense dates and conviction offenses is far from 100%. (Ex. J, Sample TBI Error) (TBI registry entry erroneously publishing a 2007 offense date for offender's qualifying offense, an offense date after the 2004 SORVA enactment, when in reality the offender's offense was committed in January 2004, before the enactment). Thus, in reality even just obtaining the information needed to attempt to "engage in complex retroactivity calculations on the fly" actually requires law enforcement to contact local county court clerks to get copies of offenders' indictments and judgments, in order to compensate for the TBI's sloppy recordkeeping. Given this additional layer of "real world" logistical difficulty it is

even more unrealistic, if not impossible,[7] for law enforcement to avoid making on-the-scene enforcement decisions "in an arbitrary or discriminatory way." *FCC*, 567 U.S. at 253 – 254.

For instance, based on *Snyder* and *Does #1 – 9* it is safe to presume that a registered sex offender who offended before Tennessee's restriction on entering public parks was enacted may, in theory, lawfully choose to go for an evening walk in the park with his wife notwithstanding SORVA's prohibition on "remaining in" a park in which minors are present. T.C.A. § 40-39-211. However, should a law enforcement officer happen upon the happy couple and learn that the husband is a registered offender, the officer will have to make a snap decision about whether or not to arrest him on the felony charge of registry violation. T.C.A. § 40-39-208. The officer will have to make this decision without being able to verify the offense date and conviction offense, because the court clerk's office for whatever jurisdiction the conviction occurred in will be closed. The officer would then have to determine "on the fly" whether or not the offense date precedes the effective date of SORVA's restriction on entering public parks,[8] and whether or not the restriction on entering public parks is "punitive" within the meaning of the *ex post facto* clause. Faced with this impossible burden, the officer will have no real way of knowing whether the arrest would or would not violate the *ex post facto* clause – and without a definitive answer on this question, one can safely assume that the officer's decision will be to arrest.

Of course, the registered offender will know all this on the front end and will wisely ascertain that his supposed right against *ex post facto* registry enforcement is nothing but a mirage. Indeed, in reality the offender and his wife will never go for that walk in the park in the first place, hiding at home as they must in order to survive. Thus, for the retroactively registered

---

[7] Outside of normal business hours court clerk's offices generally do not maintain a "hot line" to ensure that court files are available for inspection "24/7." Moreover, many clerk's offices archive their paper files from the 20th century, the period during which most *ex post facto* plaintiffs committed their qualifying offenses.

[8] The parks restriction was added in 2009. (Ex. K, <u>TBI Summary of SORVA Evolution</u>).

offender SORVA will impose a classic Due Process "void for vagueness" problem – with no way of knowing what his "real" rights are, the offender's only recourse will be to either surrender his rights and hide or stand on his rights and face the consequences. *See FCC*, 567 U.S. at 253 – 254. Therefore, because re-registration of Plaintiff under the present SORVA scheme[9] would subject Plaintiff to this Due Process "Catch 22," Plaintiff anticipates that he would bring an additional Due Process claim against the Director should he be forced to resume litigating now.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court continue the stay of his case until such time as the *Does #1 – 9* litigation process has progressed to a point at which it would be appropriate for Plaintiff and the Director to resume this particular litigation. As discussed *supra*, to do otherwise would result in a colossal waste of time, resources, and judicial economy, and risks potentially conflicting outcomes between the numerous separate *ex post facto* SORVA claims making their way through Tennessee's federal district courts. Therefore, Plaintiff respectfully requests that at this time his case remain stayed indefinitely.

---

[9] Plaintiff recognizes that Judge Trauger's anticipated process in *Does #1 – 9* holds out the hope that this "void for vagueness" problem may be solved. However, unless and until that has actually occurred Plaintiff anticipates bringing this Due Process challenge as a separate count in his anticipated future amended complaint.

Respectfully submitted,

*s/ Kyle Mothershead*
*s/ Aaron Rothbaum*
Kyle Mothershead, BPR 22953
Aaron Rothbaum, BPR 36572
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Nashville, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: kyle@relentlesslaw.com
E: aaron@relentlesslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **October 3, 2024**, Plaintiff's **Memorandum in Support of Motion to Extend Stay** was filed electronically with the Court's electronic filing system. Notice of this filing will be served on **Attorneys Brian Enright and David Wickenheiser, Counsels for Defendants Lee and Rausch,** at brian.enright@ag.tn.gov and David.wickenheiser@ag.tn.gov.

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953

24